**CITY OF PHILADELPHIA, Petitioner**

v.

**WORKERS' COMPENSATION APPEAL BOARD (SITES), Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Oct. 14, 2005.
Decided Dec. 21, 2005.

Martin G. Malloy, Philadelphia, for petitioner.

Maria Terpolilli, Philadelphia, for respondent.

BEFORE: COLINS, President Judge, and SIMPSON, Judge, and LEAVITT, Judge.

OPINION BY Judge LEAVITT.

The City of Philadelphia (City) petitions for review of an adjudication of the Workers' Compensation Appeal Board (Board) awarding compensation benefits to Frank J. Sites (Claimant). In doing so, the Board affirmed the decision of the Workers' Compensation Judge (WCJ) that Claimant's hepatitis C was a work-related occupational disease, notwithstanding the fact that hepatitis C was not specifically identified by the legislature as a compensable occupational disease until after Claimant's diagnosis.

Claimant has worked for the City both as a firefighter and a "First Responder," *i.e.*, an emergency medical technician, since 1966.[1] On December 6, 1999, Claimant was diagnosed with hepatitis C.[2] Three

---

1. Pursuant to the "First Responder" program, the nearest engine company to a medical emergency scene responds to the medical emergency and renders medical treatment to the victims, until the medical professionals arrive at the scene. WCJ Decision, September 29, 2004, at Finding of Fact 2(f) (F.F. ——); Reproduced Record at 55a–56a (R.R. ——). Claimant began training for a position in this program in October of 1988.

2. Claimant testified that he first learned that he had elevated liver enzymes in 1982, after he was released from an alcohol treatment

days later, Claimant notified the City in writing of his diagnosis and of his belief that the disease to be work-related. On November 22, 2002, Claimant filed a claim petition seeking total disability benefits for work days missed as a result of his treatment for hepatitis C. The City filed an answer denying all material allegations of the claim petition, and the matter was assigned to a WCJ for a hearing.

In support of his claim petition, Claimant, age 59, testified about his work for the Fire Department since 1966. As a firefighter, Claimant was called to automobile accidents, industrial accidents and explosions, routinely coming into contact with the blood and bodily fluids of victims. On hot days, when Claimant wiped his brow, the blood on his gloves would mix with his own perspiration and run into his eyes and face. In addition, blood sometimes saturated the leather of his gloves. In 1988, Claimant received training in how to treat medical emergencies such as heart attacks, strokes, stabbings, shootings, muggings, and baby deliveries, and became a First Responder for the City. In that capacity, Claimant treated numerous bleeding victims with direct pressure, pressure points and CPR; he also assisted in the delivery of two babies. As a First Responder, Claimant participated in approximately one thousand medical runs, many of which left him covered in victims' blood.

In November 1995, Claimant transferred from Engine Company 52 to Ladder Company 28,[3] which is sent on fewer medical runs. However, due to its proximity to busy streets and highways, Ladder Company 28 responds to many automobile accidents. The removal of victims from wrecked automobiles also involves considerable exposure to blood.

When questioned about his personal habits and health history, Claimant explained that he occasionally cuts his face shaving and that in cold weather he develops cracks in the skin of his hands. Claimant was treated for alcohol problems in 1979 and 1982; however, Claimant has not had a drink in over twenty years. Claimant has been told for years, the first time in 1982, that his liver enzymes were elevated, but he was never given any information about the significance of that condition. He was married for twenty-eight years, but he is now divorced and has a female companion. Neither his ex-wife, his present companion,[4] nor his two adult children have tested positive for hepatitis C. Claimant has never had a blood transfusion, never used intravenous drugs or snorted cocaine. He has never had his body pierced or received acupuncture treatment. As a young man, Claimant acquired two tattoos, one on each arm.[5]

Claimant testified about his hepatitis C treatment regimen. In March of 2000, he entered a forty-eight week treatment program under the direction of Dr. Kenneth D. Rothstein.[6] The treatment caused se-

---

program. Since then, every routine blood test done showed elevated liver enzymes, but he had no understanding of their significance. It was not until 1999 that Claimant was advised that he had hepatitis C.

3. Claimant was still working for Ladder Company 28 as of the date of his testimony.

4. Claimant testified that he had not had any other sexual relationships.

5. Claimant got one tattoo when he was sixteen years old and the other tattoo when he was twenty-three years old.

6. While in the study, Claimant was required to receive three shots of Interferon per week and take Ribavirin capsules daily. Claimant experienced side effects such as flu-like symptoms and severe depression with general thoughts of suicide. As a result, Claimant was prescribed Prozac during the months of the study.

vere side effects that required Claimant to call off sick.[7] Even after completing the treatment, Claimant continued to call off sick because of fatigue. These work absences occurred periodically between March 23, 2000, and October 8, 2002. Claimant believes his hepatitis C is now in remission.

Claimant also presented the deposition testimony of Dr. Rothstein, who is board-certified in internal medicine and gastroenterology. Dr. Rothstein first examined Claimant on January 5, 2000, at which time he reviewed Claimant's medical records and history. He explained that Claimant's history of elevated liver enzyme levels reflect ongoing inflammation and damage in the liver. Elevated enzymes can be caused by viruses, such as hepatitis B and C, alcoholism, autoimmune disease or obesity. Dr. Rothstein opined that Claimant's elevated enzyme levels did not have the typical pattern of alcoholic liver disease. Dr. Rothstein also explained that Claim-

ant's liver biopsy indicated that Claimant had chronic hepatitis C, which would progress to cirrhosis without treatment.[8]

Dr. Rothstein opined that Claimant had a very good response to the treatment. His hepatitis C went into remission and has stayed in remission for over two years, reducing the likelihood of a recurrence. Dr. Rothstein did indicate, though, that Claimant's disease will need to be followed on a yearly basis and that Claimant must continue his now healthy lifestyle in order to avoid the progression to cirrhosis.[9] Further, Dr. Rothstein opined that notwithstanding the remission, Claimant's liver damage will continue to cause fatigue, thereby affecting his ability to work.[10]

Dr. Rothstein stated that Claimant's alcoholism, tattoos,[11] and exposure to blood and bodily fluids while serving as a firefighter and First Responder for thirty-three years all placed him at risk for hepatitis C. However, Dr. Rothstein opined

7. The side effects include low grade fevers, chills, body aches, headaches, depression, short-temperedness, fatigue, insomnia, problems concentrating, nausea, shortness of breath, itching, sinus congestion, joint pains, and problems with urination.

8. Specifically, Claimant has Grade 3 portal cellularity and Grade 2 periportal inflammation, and Stage 2–3 fibrosis with early bridging fibrosis. The grade relates to inflammation, how much necrosis is present, and the amount of ongoing damage. The fibrosis relates to the amount of scarring and provides an estimate as to how far advanced an individual is on the way to cirrhosis. Dr. Rothstein opined that Claimant's status put him at a very high risk for progressing to cirrhosis without treatment.

9. The American Liver Foundation provides the following information on hepatitis C:

Hepatitis C virus (HCV) is the most common chronic bloodborne infection in the United States. Hepatitis C accounts for the great majority of what was referred to in the past as non-A, non-B hepatitis. The

hepatitis C virus was identified in 1989, and in 1990, a hepatitis C antibody test (anti-HCV) became available to identify individuals exposed to HCV. There is no vaccine available to prevent hepatitis C.
http://www.liver foundation.org/db/ articles/1084.

10. Dr. Rothstein was unwilling to give a definitive answer as to why Claimant cannot return to his regular hours because fatigue is a subjective complaint. He opined that the problem with fatigue and chronic hepatitis, with or without active hepatitis C infection, is that the fatigue is intermittent. A patient can sometimes go a month without fatigue, or feel fine one day and capable of full work, and then feel fatigued the following few days.

11. Dr. Rothstein pointed out that some studies have shown that there is potential for transmission of the hepatitis C virus by tattooing, but others show that tattooing is not a clear-cut mode of transmission. He opined that the relationship between tattooing and infection may be through the use of contaminated tattoo needles or contaminated ink.

that the cause of Claimant's hepatitis C was his exposure to blood while working as a firefighter and First Responder. Cuts in Claimant's skin would have served as points of entry for the virus. Dr. Rothstein acknowledged that First Responders and healthcare workers have a low rate of acquiring hepatitis C because the virus is not efficiently transmitted through occupational exposure.

In response, the City presented the testimony of Stephen J. Gluckman, M.D., board-certified in internal medicine. Dr. Gluckman examined Claimant on May 8, 2003, at which time he also took Claimant's history and reviewed his medical records. Dr. Gluckman opined that Claimant was "probably cured." R.R. 228a.[12] Dr. Gluckman opined that Claimant's prognosis is excellent and that the chance of Claimant having further problems with hepatitis C is very small; nevertheless, he recommended that Claimant take follow-up blood tests "for awhile, not forever." R.R. 252a. With respect to causation, Dr. Gluckman testified that it was impossible to determine when and where Claimant became infected with hepatitis C. He suggested that the elevated liver enzyme levels found in 1993 were a result of hepatitis C and that it was "possible" that Claimant became infected from his work or from his tattoos. Dr. Gluckman had no knowledge

of the specifics of Claimant's job as a firefighter and First Responder, but he knew that these occupations exposed him to blood.[13]

■ The WCJ granted Claimant's claim petition, concluding that Claimant had established by credible and persuasive evidence that he had sustained a work-related injury. The WCJ awarded total disability benefits for 210 intermittent days from March 23, 2000, through October 8, 2002, when Claimant was unable to work due to symptoms or treatment for hepatitis C. The WCJ suspended Claimant's total disability benefits during the same time period for the days in which Claimant worked, and suspended the benefits entirely as of October 9, 2002. Following cross-appeals by both parties, the Board affirmed the WCJ's decision. The City now petitions this Court for review.[14]

The City raises several issues that we have reordered and consolidated for purposes of our analysis. The City argues, first, that Claimant's petition was barred by the statute of limitations in the Workers' Compensation Act (Act)[15] because it was not filed within 3 years of Claimant's learning that his liver enzymes were elevated. Next, the City contends that Claimant is not entitled to occupational

12. Dr. Gluckman stated, "His hepatitis C viral lows, which is the measure of the virus in the blood, at the end of treatment and as late as two years after treatment were still negative and the vast, vast majority of such people are cured. It becomes a bit of semantics whether you say cured or lifetime remission." R.R. 228a–229a.

13. Dr. Gluckman also commented on a study relating to incidents of hepatitis C among firefighters and First Responders compared to the general population. He opined that the study reveals that there is no increased risk of infection in firefighters and First Responders compared to the general population. Howev-

er, he did not rule out the possibility that a firefighter or First Responder could contract hepatitis C while on the job.

14. This Court's scope of review is limited to determining whether the WCJ's necessary findings of fact are supported by substantial evidence or whether an error of law or a constitutional violation occurred. *O'Donnell v. Workers' Compensation Appeal Board (United Parcel Service)*, 831 A.2d 784, 789 (Pa. Cmwlth.2003).

15. Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§ 1–1041.4; 2501–2626.

disease benefits under Section 108(m) [16] of the Act because hepatitis C was not a recognized occupational disease at the time he contracted the virus and because Claimant was not engaged in an occupation that was recognized to expose him to the virus. In any case, even if Claimant were titled to compensation for hepatitis C, by virtue of the statutory presumption that infectious hepatitis is work-related where one its exposed to blood on the job, the City claims it rebutted the presumption with competent and substantial evidence. Finally, the City contends that because Claimant was not entitled to the statutory presumption established for employees with an occupational disease, he was required to prove that his hepatitis C was caused by his work; he failed to meet this evidentiary burden.

■ We consider, first, the City's contention that Claimant's petition was barred by the Act's statute of limitations. The City contends that Claimant should have known about his hepatitis C as early as 1993, but Claimant did not file his petition until November 22, 2002. The City argues that Claimant did not act in a timely fashion to perfect his right to compensation.

Section 315 of the Act requires that a claim petition be filed within three years of the date of "injury," which includes a disability resulting from occupational disease. 77 P.S. § 602. Section 315 states, in pertinent part, as follows:

In cases of personal injury all claims for compensation shall be forever barred, unless, within three years after the injury, the parties shall have agreed upon the compensation payable under this article; or unless within three years after the injury, one of the parties shall have filed a petition as provided in article four hereof. *The term "injury" in this section means, in cases of occupational disease, disability resulting from occupational disease.*

77 P.S. § 602 (emphasis added). In this case, Claimant was not disabled by his alleged occupational disease, hepatitis C, until 2000 when he began his treatment; he filed a claim petition in 2002. The City argues, however, that Claimant was required to file within three years of a test in 1993 showing that his liver enzymes were elevated. We disagree.

First, as to when Claimant learned that he had hepatitis C, his testimony was as follows:

[The City counsel]. When were you first told that your liver enzymes were high?

[Claimant]. I went for insurance, life insurance and after I left Fairmont Institute in 1982 they told me my liver enzymes were high. Since then, I had just general blood tests and they told me the same thing, but nobody ever told me that they are not supposed to be, I thought that once they were up there they stayed there, I wasn't aware that they come down.

Q. Did you consult with any doctors about any enzymes before 1999?

A. No, actually they had told me about it but they never said anything pas[t] that.

**16.** In its brief, the City refers to "the Occupational Disease Act." City's Brief at 16. However, the City simply cites this act (Pennsylvania Occupational Disease Act of June 21, 1939, P.L. 566, *as amended,* 77 P.S. §§ 1201–1603), but does not specifically cite the act or refer to any section of it in its discussion. It does refer to Section 108(m), which is located in the Workers' Compensation Act at 77 P.S. § 27.1 rather than in the Occupational Disease Act. For purposes of our analysis, we will refer only to Section 108(m) of the Workers' Compensation Act.

Q. So 1999 was the first time that you were advised that you had Hepatitis--C?

A. That is correct.

R.R. 84a.[17] In *Price v. Workmen's Compensation Appeal Board*, 533 Pa. 500, 626 A.2d 114 (1993), our Supreme Court held that the statute of limitations for an occupational disease begins to run from the date a claimant learns that his disability is caused by an occupational disease. It explained this point as follows:

> This knowledge will most often occur following a medical diagnosis of the total disability due to occupational disease made known to the claimant. While we recognize that a claimant can gain knowledge of total disability due to occupational disease by means other than a medical diagnosis, nevertheless, we view the rule stated above as establishing a *strong presumption that discovery of an occupational disease resulting in total disability first occurs when a competent medical diagnosis is made known to the claimant.*

*Id.* at 501, 626 A.2d at 115 (citations omitted) (emphasis added). Here, Claimant did not learn that he suffered from hepatitis C until December 6, 1999. Under *Price*, he satisfied Section 315 because he filed his claim within 3 years of learning of his diagnosis.

█ Second, the record does not support the City's premise that elevated liver enzymes unequivocally signify hepatitis C.

Dr. Rothstein explained that elevated liver enzymes can signify a variety of problems, such as viruses like Hepatitis B and C, alcoholism, autoimmune disease, and obesity. The City's expert, Dr. Gluckman, simply stated, "In the absence of other obvious causes in 1993, ... it's likely that the 1993 elevation was due to hepatitis C." R.R. 230a.[18] The City's position is untenable because it would require Claimant to deduce hepatitis C from the presence of elevated liver enzymes even though the medical evidence showed that hepatitis was one of several inferences to be drawn from elevated liver enzymes.

Third, Claimant was not disabled by hepatitis C until 2000, in the course of his treatment for hepatitis C. Section 315 of the Act bars the filing of claims more than 3 years after the "injury," a term defined as "disability resulting from occupational disease." 77 P.S. § 602. The claim petition was filed on November 22, 2002, which was less than three years after Claimant's first day of disability, March 23, 2000. Under Section 315, Claimant was not "injured" until he was disabled by his hepatitis C.

In sum, the City's argument is not supported by the record, and it is not consistent with the language of Section 315. Claimant filed his claim petition within three years of being diagnosed with hepatitis C and within three years of the onset of a disability resulting from that disease.

17. Claimant then states that Dr. Rothstein, whom Claimant first saw in January 2000, informed him that he could have contracted hepatitis C on the job. Dr. Rothstein, however, in his testimony, provides a definitive diagnosis: "[The cause of Claimant's hepatitis C] was his occupational exposure to blood while working as a firefighter." R.R. 155a–156a.

18. The WCJ, as the ultimate fact finder in workers' compensation cases, has exclusive province over questions of credibility and evidentiary weight, and is free to accept or reject the testimony of any witness, including a medical witness, in whole or in part. *General Electric Co. v. Workmen's Compensation Appeal Board (Valsamaki)*, 140 Pa.Cmwlth.461, 593 A.2d 921, 924 (1991). Here, the WCJ credited the testimony of Dr. Rothstein that there was more than one explanation for elevated liver enzymes and the testimony of Claimant that he was first informed of the hepatitis C diagnosis in December 1999.

The Board correctly held that Claimant's claim petition was timely filed.

■ The City next argues that the Act did not authorize an award of compensation to Claimant because hepatitis C was not recognized by the legislature as an occupational disease until 2001, *after* Claimant's disease caused him to miss work in 2000. The Board disagreed because it found that "infectious hepatitis," of which hepatitis C is a type,[19] was a recognized occupational disease as early as 1972. In addition, the Board believed that, in any case, the 2001 amendments applied to Claimant because that was the statute in effect when Claimant filed his claim petition.

We begin with the applicable statutory language. Section 108 of the Act states, in pertinent part, as follows:

The term "occupational disease," as used in this act, shall mean only the following diseases.

\* \* \*

■ (m) Tuberculosis, serum hepatitis, *infectious hepatitis* or hepatitis C in the occupations of blood processors, fractionators, nursing, *or auxiliary services* involving exposure to such diseases.

(m.1) Hepatitis C in the occupations of *professional* and volunteer *firefighters,* volunteer ambulance corps personnel, volunteer rescue and lifesaving squad personnel, *emergency medical services personnel* and paramedics, Pennsylvania State Police officers, police officers requiring certification under 53 Pa.C.S. Ch. 21 (relating to employees), and Commonwealth and county correctional employes, and forensic security employes of the Department of Public Welfare, having duties including care, custody and control of inmates *involving exposure to such disease.* Hepatitis C in any of these occupations shall establish a presumption that such disease is an occupational disease within the meaning of this act, but this presumption shall not be conclusive and may be rebutted.

77 P.S. § 27.1 (emphasis added). The 2001 amendments substituted "infectious hepatitis or hepatitis C" for "infectious hepatitis" in subsection (m), and added subsection (m.1). Section 1 of the Act of December 20, 2001, P.L. 967. To prove that a disease is occupational, claimants are assisted by the statutory presumption[20] set forth in Section 301(e) of the Act. It states in pertinent part as follows:

If it be shown that the employe, at or immediately before the date of disability, was employed in any occupation or industry in which the occupational disease is a hazard, it shall be *presumed that the employe's occupational disease arose out of and in the course of his*

---

19. *See Jeannette District Memorial Hospital v. Workmen's Compensation Appeal Board (Mesich),* 668 A.2d 249, 250 (Pa.Cmwlth.1995) (defining non-A, non-B Hepatitis as hepatitis C).

20. Generally, for a claimant to receive benefits, he or she must establish that (1) his or her injury arose in the course of employment, and (2) that the injury was causally connected to his or her employment. *Jeannette District Memorial Hospital,* 668 A.2d at 251. Where the causal relationship is not obvious, un-equivocal medical testimony is required. *Id.* However, once a claimant proves that he or she is afflicted by one of the specified enumerated occupational diseases in Section 108, a rebuttable presumption that the injury arose in the course of employment exists. *Buchanan v. Workmen's Compensation Appeal Board (City of Philadelphia),* 659 A.2d 54, 55 (Pa. Cmwlth.1995). This presumption, though, may be rebutted by substantial competent evidence. *Id.*

*employment,* but this presumption shall not be conclusive.

77 P.S. § 413 (emphasis added).

Here, Section 108(m.1) was the law at the time Claimant filed his petition, and even the City implicitly concedes that Claimant meets the requirements of Section 108(m.1), as found by the Board. The Board also found that, in any case, hepatitis C was a compensable occupational disease under Section 108(m) in both its 1972 and 2001 versions. The Board reached this conclusion by relying upon this Court's precedent.

In *Jeannette District Memorial Hospital v. Workmen's Compensation Appeal Board (Mesich),* 668 A.2d 249, 251 (Pa. Cmwlth.1995), we considered whether a nurse was properly awarded compensation for hepatitis C in 1995 under the 1972 version of Section 108. We found that the nurse's hepatitis infection, namely non-A, non-B hepatitis (hepatitis C), was "infectious hepatitis," as that term is used in Section 108 of the Act. Further, her work as a nurse in the intensive care unit, where she was exposed to blood and bodily fluids, entitled her to the statutory presumption. We disagreed with the employer's argument that the nurse had to prove exposure to the hepatitis virus in a discrete incident. Because the employer could not rebut the presumption, claimant was awarded compensation.

In *Sun Home Health Visiting Nurses v. Workers' Compensation Appeal Board (Noguchi),* 815 A.2d 1156, 1160 (Pa. Cmwlth.2003), we reiterated that hepatitis C has been recognized as an occupational disease since 1972 when Section 108(m)

added "infectious hepatitis" to the list of occupational diseases. We rejected the employer's argument that because hepatitis C was not even identified or named until 1989, it was not one of the "infectious hepatitis" viruses covered in Section 108(m). Further, we found that the 2001 amendment, which used the term hepatitis C for the first time, merely clarified what had been the law since 1972.[21]

Without distinguishing *Jeannette District* or *Sun Home,* the City argues for a contrary result. It argues that because the 2001 amendment to Section 108 shifted the burden from respondent to petitioner to rebut the presumption, this shift imposed a new legal burden, thereby effecting a change in the substantive law. As such, Section 108(m) and (m.1) may not be applied retroactively. We find, however, that an inquiry into the retroactivity of the 2001 amendment is not necessary in light of the legislature's enacting language and the timing of Claimant's claim petition.

The December 2001 amendment to Section 108, which added "hepatitis C" to Subsection (m) and all of Subsection (m.1) to Section 108, was enacted to take effect "immediately." In our view, this language indicates that the amendatory provisions were to apply to any claimant whose claim is not barred by the statute of limitations. As stated in *Creighan v. City of Pittsburgh,* 389 Pa. 569, 575–576, 132 A.2d 867, 870 (1957), "a statute is not regarded as operating retroactively because of the mere fact that it relates to antecedent events, or draws upon antecedent facts for its operation."[22] Here, we have already

---

21. Indeed, we found that the 2001 amendment, for purposes of statutory construction, demonstrated legislative approval of our 1995 interpretation in *Jeannette District. Sun Home,* 815 A.2d at 1160–1161.

22. In *Creighan v. City of Pittsburgh,* 389 Pa. 569, 132 A.2d 867 (1957), a fireman sued the City of Pittsburgh for disability benefits under the Heart and Lung Act, Act of June 28,1935, P.L. 477, *as amended,* 53 P.S. § 637 (Supp. 1976–1977). Because he contracted tubercu-

determined that Claimant filed his claim petition within the limitations period. Thus, Claimant is entitled to the statutory presumption in Section 108(m.1), which was in effect on the day Claimant filed his petition.

■ We also reject the City's argument that Claimant was not entitled to benefits under Section 108(m) of the Act because he was not employed in "auxiliary services." The occupations at risk for hepatitis included in Section 108(m) are "the occupations of blood processors, fractionators, nursing, or *auxiliary services involving exposure to such diseases.*" (emphasis added).[23] The City argues that a firefighter and/or First Responder[24] is not en-

gaged in an "auxiliary service." We disagree.

There is no dispute that Claimant was directly exposed to blood and bodily fluids in his work. Claimant was, in fact, often covered in blood, which mixed with his perspiration and ran into his eyes and face. As such, Claimant's occupation is precisely the type of occupation that would constitute "auxiliary services" because it involves exposure to the infectious diseases enumerated in Section 108(m). *See, e.g., Browning–Ferris Industries of Pennsylvania, Inc. v. Workmen's Compensation Appeal Board (Jones),* 151 Pa.Cmwlth.529, 617 A.2d 846, 850 (1992) (removal of waste material from hospitals found to be an "auxiliary service" under Section 108(m)

losis over two years prior to the effective date of the Heart and Lung Act, the City argued that the claim did not come within the purview of the statute. Our Supreme Court disagreed:

> The appellee [fireman] is not claiming any benefits prior to the effective date of the Act but only thereafter. A recognition of appellee's claim does not require that we place a retroactive construction on the Act, but simply that we apply the Act to a condition which existed on the date when the Act became effective even though such condition resulted from events which occurred prior to its effective date.

*Id.* at 575, 132 A.2d at 870. The Supreme Court acknowledged that compensation was to be paid to firemen who met the specific statutory requirements, but it rejected the City's contention that a fireman meeting those requirements could be denied compensation because his condition was *discovered* prior to the effective date of the Heart and Lung Act. This would mean an identically afflicted fireman who discovered his illness the day after enactment of the Act would be compensated. The Court found such an interpretation to be "particularly unfair and unsound" in view of the "extreme difficulty, if not actual impossibility, of pinpointing with any degree of accuracy the actual time of the onset of tuberculosis." *Id.* at 577, 132 A.2d at 871.

23. Because "auxiliary services" is not defined in the Act, both parties direct our attention to

the definition of that term in the Practical Nurse Law, Act of March 2, 1956, P.L. (1955) 1211, *as amended,* 63 P.S. § 651–667.8, which is as follows:

> Auxiliary services rendered by persons carrying out duties necessary for the support of nursing service, including those duties which involve minor and very basic nursing services for patients, performed in health care facilities or elsewhere *under the direction of licensed physicians or* as delegated by licensed registered nurses and performed *under the direction of professional nurses* or licensed practical nurses.

63 P.S. § 653(10).

24. The City contends that Claimant should be precluded from arguing that he was an EMT/ First Responder because his claim petition listed his occupation as simply "firefighter." However, in his claim petition, Claimant describes his duties as, "Responding to medical emergencies as part of my duties as a First Responder or responding to automobile accidents, industrial accidents and other emergency medical services including suicides, gunshot wounds, stabbings and baby deliveries, etc." R.R. 1a. Even though Claimant listed his job title as "firefighter," the additional description of his job duties clearly sets forth his position as a First Responder. As such, the City's argument here fails.

because of evidence of routine and direct exposure to items contaminated with blood and bodily fluids, thereby entitling a refuse worker to the statutory presumption set forth in Section 108(m) of the Act.).

In sum, consistent with our precedent in *Jeannette District* and *Sun Home*, we hold that Claimant was entitled to compensation under Section 108(m) of the Act, in both its 1972 and 2001 versions. Hepatitis C is a type of "infectious hepatitis" that Section 108(m) recognizes to be an occupational disease for persons engaged in "auxiliary services," such as first responding, which expose workers to blood and bodily fluids that carry the virus. We further hold that Claimant's claim was also governed by Section 108(m.1) of the Act because it was the law at the time Claimant filed his petition, and the statute of limitations had not yet run. Thus, the Board correctly applied Section 108(m) and (m.1) of the Act to Claimant's petition.

■ Next, the City contends that it rebutted the statutory presumption for establishing an occupational disease set forth in Section 301(e) of the Act,[25] and the Board erred in holding otherwise. Here, the City relies on Dr. Gluckman's testimony that it was impossible to determine when and where Claimant became infected with hepatitis C.

An employer must rebut the statutory presumption with competent, substantial evidence. *Buchanan v. Workmen's Compensation Appeal Board (City of Philadelphia)*, 659 A.2d 54, 55 (Pa. Cmwlth.1995). Dr. Gluckman stated that it was *possible* that hepatitis C was transmitted to Claimant while on the job. He also indicated that it was *possible* that Claimant became infected while receiving his tattoos.[26] However, "[m]edical evidence which is less than positive or which is based upon possibilities may not constitute legally competent evidence for the purpose of establishing [a] causal relationship." *Lewis v. Workmen's Compensation Appeal Board (Pittsburgh Board of Education)*, 508 Pa. 360, 366, 498 A.2d 800, 802 (1985). Because Dr. Gluckman's opinion is less than "positive," it was not legally competent to establish a causal relationship between Claimant's hepatitis C and the tattoos he received when he was a youth.

Moreover, the WCJ credited the testimony of Dr. Rothstein, who expressly and unequivocally opined that Claimant contracted hepatitis C from his occupational exposure to blood and bodily fluids while working as a firefighter and First Responder. Dr. Rothstein explained his opinion by noting that Claimant did not have any other documented modes of transmission. Matters of credibility are within the exclusive province of the WCJ as factfinder. *Browning–Ferris*, 617 A.2d

---

**25.** Again, the language of Section 301(e) of the Act reads, in pertinent part:
  If it be shown that the employe, at or immediately before the date of disability, was employed in any occupation or industry in which the occupational disease is a hazard, it shall be *presumed that the employe's occupational disease arose out of and in the course of his employment, but this presumption shall not be conclusive.*
  77 P.S. § 413 (emphasis added).

**26.** The WCJ also notes that Dr. Gluckman acknowledged,

(i.) Hepatitis C is a virus that is a blood-borne pathogen which is an infectious agent that is transmitted via exposure to blood, (ii.) that the Claimant was clearly *exposed to blood* while he administered medical care, (iii.) that it was possible that work was the way that Claimant had been infected with the hepatitis C virus, and (iv.) that one cannot rule out the possibility that the Claimant contracted hepatitis C on the job.
F.F. 10.

at 850. Thus, we conclude that the WCJ did not err in determining that Claimant was exposed, during the course of his employment, to hepatitis C, an occupational disease compensable under Section 108(m) and (m.1) of the Act, and that the City failed to rebut this presumption with credible and substantial evidence.[27]

Accordingly, we affirm the decision of the Board.

### ORDER

AND NOW, this 21st day of December, 2005, the adjudication of the Workers' Compensation Appeal Board, dated June 23, 2005, in the above-captioned matter is hereby affirmed.

27. Since we conclude that Claimant's hepatitis C is an occupational disease under Section 108 of the Act, it is unnecessary to address the City's contention that Claimant also failed to establish his entitlement to benefits for hepatitis C as an injury under Section 301(c)(1) of the Act, 77 P.S. § 411(1).